Mr. DeBrun, may it please the Court, this is the second case of ineffective assistance of counsel at sentencing. The jury in this case heard how Petitioner Raulerson was brutally beaten as a four-year-old boy, left isolated and alone. Dr. Grant testified that Raulerson and his father fought like adults in the yard when Raulerson was 10, but presented nothing of the evidence of abuse that we presented in State Habeas, in which Petitioner was beaten savagely when he was 4, when he was 5. In addition, the jury heard nothing in this case of Petitioner's extreme mental illness and emotional disturbance, which was directly related to the bizarre and, frankly, grotesque elements of the crimes in this case. The jury heard... You mean to say that they heard nothing at sentencing, or they heard nothing at all? So it wasn't some evidence along these lines presented during the guilt phase? Your Honor, I meant to say that the jury heard nothing at all about the critical mitigation facts that I've identified, and that is specifically about Raulerson being abused as a young child, about Raulerson's mental illness, and third, about the fact that despite the deprivations that he had experienced and despite the clear troubles that Raulerson had, there were family or friends who would have come to the court at sentencing and presented a reason why Mr. Raulerson's life should be spared. Instead, counsel presented nothing at sentencing, not even a single witness, and those facts that I identified did not come out at the guilt phase of the trial. And if the court would indulge me, I would urge... I thought Dr. Grant testified about his abusive father and how they would fist fight like two adults. That is correct, Your Honor. That is exactly what Grant said. And what I'm saying is it is materially different. That was during the guilt phase, right? Well, it was during the guilt phase, and that's not the critical fact. The critical difference is it is one thing to describe a 10-year-old boy fighting with his father like an adult, fist fights in the yard. That is not a four-year-old infant being beaten savagely with a belt with a switch by his mother to the point where he's finally left to hide under the porch in isolation. That is very different. I would urge the court to go to the record in this case. It is the appendix, page 145, and just look at what Dr. Grant was asked and look at what he testified. And if the court would indulge me, I'll just read. It's really... It's one paragraph. The question came, now going back to your investigation, can you tell us, can you give us some background and give the jury some background as to what you've discovered about Mr. Rawlinson's family life as he grew up? And again, this is in the guilt phase. And Dr. Grant says this, well, he comes from a very, well, if you'll pardon the expression, dysfunctional family. From a very early age, you know, especially after the head injury, he never seemed to fit into the family. He and his father would often get into arguments. His father appeared to be an abusive father. He drank. He would not spank Mr. Rawlinson. He would hit him in the head often with his fists. His mother described when he was 10 years old, his father, at the age of 10 and it continued, he and his father would actually get in the yard and fistfight just like adults. That's a 10-year-old boy who is basically the equivalent of an adult. He's fighting with his father man to man. That is not the kind of abuse that was presented in state habeas through Rawlinson's sister, through his neighbor, through his older cousin. And so the jury heard nothing of that. And in a case like this, where the state not only had evidence of extremely serious crimes, which we obviously acknowledge, and the prosecution presented additional evidence of aggravation in the form of assaults on his mother, assaults on his sister, and other incidents, the tide was overwhelming in terms of the aggravation that was presented. And in response, at sentencing, there was nothing, not a single witness. And the reason for that, and the reason why it was not a reasonable strategic decision, is the evidence shows the counsel did not conduct a mitigation investigation. He put all of his eggs, he put all of his eggs in a single defense, and that was a guilt-faced defense, the defense of mental retardation. He did not investigate a mitigation case, and when the jury rejected mental retardation, he had nothing, he presented nothing, and I submit this is truly the exceptional extreme case of ineffectiveness. I know the court hears many of these cases, and every case turns on its own facts, but I submit it is extraordinarily rare for the court to hear a case where at sentencing not a single witness was called, not a single record was presented, where counsel argued basically in 10 pages of transcript, said virtually nothing about the defendant, and pleaded for mercy from the Bible. That is not consistent with defense counsel's duties as set forth in Wiggins and Strickland and other critical cases. The decision in Wiggins came down before the state habeas court decision. The state habeas court didn't even cite Wiggins in its decision. And for those reasons, I submit that the state is wrong in arguing that this mitigation information came out in guilt, and therefore it didn't need to be presented again at sentencing, and therefore there is no ineffectiveness here. If you look at the record, if you look at the materials that we've set forth, the material facts were not presented at guilt. What's critical, and I emphasize this, Dr. Grant was a witness on mental retardation. Therefore, as this court knows for many cases, the key is not just to focus on IQ, but you also have to show deficits in adaptive functioning. So one of Dr. Grant's principal purposes was to show that Rollerson didn't fit. So in the paragraph that I read, the point was he didn't fit with his own family. He argued with his father. He fought with his father. The same thing at school. Dr. Grant emphasized here was someone who didn't fit at school. He tripped his teachers. He was aggressive. He was assaultive. He didn't fit. So Grant is not a mitigation witness. He is not trying to present the jury a reason to spare Rollerson's life, which is the purpose of the sentencing hearing. Grant was to show that this person qualified as mentally retarded. He didn't fit at home. He didn't fit at school. He didn't fit anywhere. He qualified. But if he's found guilty, if he were found to be mentally retarded, it would spare his life. Absolutely. And I don't fall. So it's not true to say that he wasn't a witness in mitigation. Well, Your Honor, I perhaps misspoke. I did not mean to do that. It is true, and I will not deny that counsel presented a defense at guilt of mental retardation. If that had been effective, Rollerson would not have been eligible for the death penalty. And counsel recognized from the very beginning there was only one issue in this case, and that was life or death. There was no defense to the merits. He didn't present a defense to the merits. There was no dispute. There was DNA evidence. There was evidence that was found. It was a grotesque, bizarre crime, a conviction for necrophilia, evidence that the defendant told the police that he went back to the scene the next day, apparently to have sex. And three people were killed. It was not a single murder or a double murder. It was a triple murder. It was a triple murder, as Cooper was, Your Honor, another case of this court in 2011. I would like to separate your claim about investigation from presentation by counsel. That is, the decision made not to present what they did discover. And I want to just isolate investigation because that is another claim. Is that correct? It is correct, and I believe both are present in this case. I understand, but I want to make sure I understand the investigation claim because if the investigation was adequate within constitutional bounds, that is one thing, and then we go to the next issue. But if the investigation itself was inadequate, then you don't have to go to the next issue necessarily. I want to make sure I understand the record. The trial counsel hired five different experts. Is that correct? To insist before trial, and that is Ms. Sumner, a licensed clinical social worker. Is that correct? Yes, Your Honor. Okay. I am just trying to make sure. I read the reports. I am just trying to make sure I am right about the five experts. So a psychologist, Dr. Grant, whom we have just discussed, a psychiatrist, Dr. Savino. Is that correct? Yes, Your Honor. And a neurologist, Dr. Baker. Yes, Your Honor. And a neuropsychologist, Dr. Chackness. Yes, Your Honor. Okay. And the licensed social worker here looked like to me was doing mitigation development. Am I wrong about that? Yes, you are. You are saying it was all mental retardation. The social history that was done by the social worker Sumner, as you can see from the materials are in the record in the supplemental appendix, she was employed by Dr. Savino. She was not engaged by counsel to do a mitigation investigation. Counsel was offered the services of a mitigation specialist and he rejected those services. Okay. Well, let's talk about what actually did happen. I am just trying to see what counsel did. And then I can decide or help decide. That will help me decide whether that was ineffective. And she interviewed the mother, the father, the uncle, two uncles. Is that correct, Ms. Sumner? I believe she only interviewed the mother and two uncles. Okay. And that appears in the supplemental appendix, I believe at page 100, if my memory is correct, but it is. Okay. So she did a social history. I understand you said it is for a different purpose. For Dr. Savino. And it was not by the lawyer, it was by the neuropsychologist, right? Or the psychologist. By Dr. Savino. So just if I can address the record, because I don't want to, I don't want to dispute what was done. Obviously counsel hired Dr. Savino. For whatever purpose it was done, it was done. So I don't understand what the purpose has to do with it. If you find out information, you find out information, however, whatever purpose. My point is that information, there's nothing in the record that that information was ever used by counsel. Again, Dr. Savino. We know it wasn't used because nothing was presented. Even was reviewed by counsel. So you're saying it wasn't even reviewed. There's no evidence in the record that counsel used it to consider a mitigation case. Dr. Savino, this is very important. Did counsel get a copy of Savino's report? I will accept that perhaps he did. I don't know if it's in the record one way or the other. Dr. Savino is very important, Your Honor, and if I could address Dr. Savino. He was hired to explore a defense of insanity. And in fact, at one point in this trial, the defense filed a notice of an intent to raise a defense of insanity. And the other experts that you have identified were done to explore an organic. I'm trying to find out how much of the personal social history of the defendant was investigated and discovered. And then I can go to presentation. So if you don't want to focus on that, that's fine. But I want to focus on it. And so I want to make sure I understand that Ms. Sumner did interview certain people. And it looked like she got a lot of records. Somebody got medical records. Because we have cases where they never get social history. They don't get medical records. They don't get anything. And I'm trying to see what they obtained here. Those records were obtained. From Ware County Hospital? From various sources. I don't dispute that, Your Honor. Again, all of that information. And there were extensive school records about his schooling from the Ware County. All the school records, school system records were obtained. Is that correct? There were some school records. Not the record that we've identified where Rollison goes through questions and identifies at age 11 that the best thing that could happen to him is to die. That record was not identified, was not presented. That information was gathered by Dr. Grant to support the claim that Rollison didn't fit at school. You're just really arguing. And I'm just trying to go to facts and trying to understand. They understood. They learned that he had had a prior suicide attempt. Is that correct? Yes, Your Honor. I mean, an actual serious suicide attempt. Yes, Your Honor. Okay. They knew that. The petitioner tried to shoot himself in the chest with a gun. Right. He was not even successful at that and he didn't kill himself. But that information was investigated and discovered. It was in the record. Right. It was not investigated by counsel for purposes of litigation. Did counsel say he didn't know about it at the habeas hearing? Did he say, I never knew about all that? I thought he said, I knew all of that and I decided not to present it. Well, again, the clear testimony said habeas was the lawyer in charge of mitigation was Mr. Wilson, who was the, Leon Wilson, the more senior of the two lawyers. Who had died. He had died at the time of the direct appeal. Mr. Hatfield, the younger lawyer, was in charge of the mental retardation defense and he testified it's the habeas. I don't dispute all of that information that you're referring to that's in the state's brief that is listed was obtained. Okay. So you don't dispute the state's brief about what information they did discover. Well, when you say they, I think that's. Whoever, somebody got it. Somebody got that information. Yes. Most of it was presented. And you're saying the state had the burden to show that the lawyer reviewed it as opposed to your showing the lawyer didn't ever know about it. No, I'm not saying it's the state's burden. Okay. I am simply saying that information was gathered largely to support Dr. Grant in his effort to show mental retardation. I'm actually trying to help you with really whether this case is about presentation versus investigation. But it sounds like you think it's as much about investigation as presentation. Well, I do think it is both because again, of the 33 witnesses who we submitted affidavits at State Habeas, every one of them said that they were never contacted by counsel. They never were approached about the possibility. We understand that. But we have cases where have far less investigation, far less information was discovered that are binding precedent. Okay. On the investigation issue. That's why I'm trying to figure out where we really should be focusing here. I would urge you to compare this case with Ledford, which is a case of just last year of this Court. I wrote it. So I'm familiar with it. But I think it's a useful, because there were various parallels. So as you recall from Ledford, again, there was information presented at the guilt phase because again, in that case, there was an effort to show involuntary intoxication as a guilt defense. And you noted that there was significant mitigation presented. You noted that there was a mitigation investigation done, an effort to develop evidence for sentencing. And in fact, it was presented at sentencing through one witness, the mother, who was so good that counsel then made a strategic decision to stop. I thought we had a lawyer here who had done a bunch of several capital cases. Well, Mr. Wilson hadn't tried a capital case for over 20 years. He was 70 years old, I think, at the time of trial. How many capital cases had he done before? I think he had done two or three. Only two or three. I was thinking it was five or six. And he never had a life sentence, I mean, never had a death sentence. I believe that is true, Your Honor. I don't dispute that he had 50 years of experience. And I don't dispute that he had never lost a capital case. But it is, what I do submit is the record in this case will show that he made no effort to develop mitigation evidence for sentencing, which is distinct from insanity information, from mental retardation. Those are basically guilt phase issues. I don't dispute that Mr. DeBruin, could I ask you to address the issue concerning the beyond a reasonable doubt standard? Certainly, Your Honor. Again, I don't want to detract you from the other argument, too. But I'd like to at least hear something about that contention while you're up here. Yes. I want to say, of course, I am well aware that this Court, not only this panel, but the Court en banc has obviously addressed the burden of proof issue at great length in multiple cases, most significantly in Hill v. Humphrey or Humphrey v. Hill. What I want to emphasize about that issue is three things. First, this Court, although it addressed the burden of proof issue, it expressly recognized in Humphrey v. Hill that the Court was not addressing the due process issue because it wasn't presented in that case. It hadn't been raised. It wasn't part of the question that the Court asked to be addressed. It was not part of the case. And so the Court expressly recognized that the due process issue was not before it. Secondly, obviously a critical issue in all of these cases is the effect of AEDPA and what the standard of review is under AEDPA. And I think what this Court emphasized most critically in the Hill case was that AEDPA applied, and so the issue was whether or not it was clearly established at the time that Georgia courts ruled that the burden of proof was inconsistent with Atkins. In this case, we submit the Court should evaluate this issue de novo because the State Habeas Court, when it made its decision, made clear it was finding that the issue was not before it on grounds of res judicata, and the reason for that is because this issue had been raised on direct appeal. But thirdly, even... That was a State issue, though, really, wasn't it, on direct appeal? Well, it was, and that's why the Court erred. I mean, so the Federal issue really was raised on State habeas. It did seem to me that the Court decided that claim on State habeas, did it not? Well, the Court addressed it under the heading of claims that were res judicata, and what the State had argued below... The State one would have been res judicata. Well, it would not have been, and this is what we argue, it was not a decision that was properly barred because on direct — at the time of Mr. Rolison's direct appeal, Atkins had not been decided. So he could not raise the claim that the burden of proof beyond a reasonable doubt is inconsistent with the fundamental right recognized in Atkins. In the Leland case, the Supreme Court recognized that a State-created right, such as an insanity defense, which is merely a State-created right, is not subject to the same procedures as a fundamental right under a Federal Constitution. I think what we're trying to find out, but wasn't the Federal claim, I know it's under the res judicata heading, but wasn't there a separate paragraph that went to the Federal claim? Let's just say, we totally agree with you, it was a State claim. He didn't have a Federal claim. He didn't need a Federal claim because he had a State statutory claim to the right. So he didn't need a Federal claim. He raised a Federal claim in the State habeas, and the question we have here is whether or not we have a ruling on the merits of the Federal claim in the State habeas proceeding. Is that the issue? That is the issue. Okay. The Federal — the district court — It doesn't matter what the district court did. So tell us why there was no State adjudication on the Federal claim in the State collateral proceedings in the second paragraph of the opinion, even though there is a heading, res judicata. Help me with that. Two reasons. First, the State argued to the State habeas court, the Attorney General, that this claim was barred by res judicata, and significantly, the second point they made was that Adkins did not create an exception to res judicata based on the narrow miscarriage of justice standard. And so in that second paragraph, the State habeas court accepted the State's argument that there was no exception to res judicata that applied, and therefore the issue was precluded. And as a result, I believe that the fairest reading of the State court decision is that the court did not make a decision on the merits, but found that res judicata applied, there was no exception to res judicata, and the issue was precluded. And that was air because that claim could not have been raised on direct appeal. Secondly, the AG argued even below in the district court that this claim was barred by res judicata. It did not contend that there had been a ruling on the merits. And so I submit for that reason this court should review it de novo. Let me also just state that as to the due process claim, even if you review it under AEDPA, I would submit that the decision of the Georgia courts in upholding the burden of proof is, in fact, inconsistent with clearly established law in Adkins for this reason. The Georgia Supreme Court in Head v. Hill recognized that the burden of proof served a function to narrow those who were eligible for the defense. The words of the court were that the burden was permissible because it limits the exemption to those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt. And I submit that's inconsistent with Adkins, which holds that even the mildly mentally retarded cannot be executed, and that Adkins sets forth a standard that where there is a national consensus about who is mentally retarded, that is the standard that governs. I'm already into my rebuttal time. I'd like to — You'll reserve all your rebuttal. You are answering the court's questions. We thank you for your argument, and we will hear from the State. Thank you, Your Honor. Thank you, Your Honor. My name is Serena Graham, and I'm here on behalf of the appellee respondent. I would like to take and address the court's questions regarding the burden of proof first, if that's okay. The State obviously does contend that that is a ruling on the merits by the State habeas court. If the court is not inclined to find that the Georgia Supreme Court's decision, as it was a state right, it was not a federal right at that time not to be eligible for the death penalty if you're intellectually disabled, if the court finds that that was not a ruling on the merits, the State habeas court did rule on the merits. However, as also mentioned in our brief, the claim was not raised in the CPC application to the Georgia Supreme Court, so under this court's recent ruling in Hitson, it would be unexhausted. But if the court is not inclined to agree that it's unexhausted, then we would say that there is absolutely a decision on the merits. Whatever the State argued in its post-hearing brief to the State habeas court does not change the court's statement in the order which says this court denies petitioner's claim that the United States Supreme Court's decision in Atkins v. Virginia declared this burden of proof of mental retardation unconstitutional. And then it says that it's bound by the recent decision of Head v. Hill, which clearly evaluated the burden of proof under the 14th and the 8th Amendment. So it is our understanding that is a decision on the merits. Understanding your exhaustion and other arguments, can we talk about the merits of that claim? Sure. Why do you think, and let's do it at two levels. So first, let's do it at a de novo level, and then we'll talk about epidefference. So my first question puts epidefference to the side for just a moment. Tell me why you think a beyond a reasonable doubt standard for establishing mental disability is constitutional under the Due Process Clause. Well, I would refer then to what the Georgia Supreme Court stated in Head v. Hill, that this claim is very similar to a claim of insanity, and that when they looked at that under Leland v. Oregon, and when they did look at that under Leland v. Oregon, obviously they looked to see what the other states did, but then they looked at the rules and the laws that complemented what the defendant had to raise in order to prove insanity. And as this court enunciated very well, and I will not enunciate it again, at Hill v. Humphrey and en banc, it lays out all of the different benefits that a defendant has in They can get whatever experts they want. They can present as however much they want during the guilt phase of trial. They can raise it on direct appeal. They can also present intellectual disability in the sentencing phase under no standard at all. That has nothing to do with the burden of proof. But it does under Leland v. Oregon. It says that you look at the entire system when you're looking at the Due Process Clause. Even under the Due Process Clause, it says you look at everything. You don't just look at the burden of proof. Well, but, you know, in a slightly related, not identical mental health scenario, the Supreme Court has held that a state cannot place a clear and convincing burden on someone trying to establish lack of competency. True. And why do you think that's different from, again, we're talking De Novo, we'll talk Ed Penn a second, okay, because I think those are different questions. But why do you think that is materially different than proving mental disability? Well, I do think that incompetence is materially different than an affirmative defense of guilty but intellectually disabled. But it's not just guilty but mentally disabled. It's also a constitutional protection against execution, even if you're guilty. And I understand that, Judge Jordan. And I would then refer to the language in Cooper v. Oklahoma where it talks about the rudimentary right of incompetence that is rooted in our jurisprudence that goes back for centuries. We're not talking about, this was a right that was created in the federal right, in the federal realm, only 16 years ago. And that is integral to Cooper v. Oklahoma. You have to look at it and that is something that has been around for a long time. And if you also look at, Georgia was the first state that enacted a statute that says that you could not execute the intellectually disabled. And they were the first ones to come forward with that. And they were first ones to set that burden of proof. And when you look at Cooper v. Oklahoma, it looks at what that burden of proof was 200 years ago when they were looking at their jurisprudence, or maybe I have my years wrong there. But they say, you know, the clear and convincing standard was never the standard back then. But yet here, the first state to come out and say, we will not execute the intellectually disabled, we chose beyond a reasonable doubt. And I don't know how you separate that out from Cooper and then just take, pick specific language to say that our standard would be unconstitutional. The Supreme Court, you can correct me if I'm wrong, but again, talking de novo, the Supreme Court has never upheld a beyond a reasonable doubt or clear and convincing standard for the demonstration of something that is constitutionally based. Am I right or wrong about that? I wouldn't say that you're wrong about that. Okay. Well, then, again, at the de novo level of analysis, and I speak only for myself, not for my colleagues, that I think creates a problem. Let me ask one more question on the de novo front and then we'll move to AEDPA. Since the discovery took place back in what, 2008, 2009, pursuant to the discovery that Judge Alaimo allowed? Yes. Right. Has anybody in a capital setting been able to demonstrate to your knowledge mental disability beyond a reasonable doubt in Georgia? There actually were several cases that were listed in Hill versus Humphrey. I don't know if they were since 2008. There was one. There was Judge Hall's opinion for the court listed one case beyond 2008. It was one 2010 case. So I'm aware of that one, of course. So my question is whether you know, and if you don't know, it's fair enough to say you don't know. I'm asking whether since then there has been any capital defendant who has been able to establish mental disability beyond a reasonable doubt in Georgia. I'm trying to update the discovery if I can. Sure. I did actually look that up. I cannot tell you that it was before 2008 that those particular cases, and I don't have them in front of me. I'm happy to file a supplemental on that. But I can say that just saying that there isn't a reported opinion finding that they were able to prove their intellectual disability beyond a reasonable doubt doesn't take into scope all of the cases in which they didn't go to trial or in which they didn't receive the death penalty and they did not appeal. So, I mean, that would require a much larger review than just what has been reported. Well, reported or non-reported, your office, you may not know, but your office may know what that universe of cases was and what the winnowing process was for that, right or no? We don't keep track of that, Judge Jordan. I know that we did have one case that was sent back, a stripling, but I do not recall if they pled that out or not. I think they did. And that was on intellectual disability. We don't keep a record of which cases go to trial and then don't. It only comes to our office once there's been a notice of appeal basically filed in the Georgia Supreme Court. Fair enough. So, as we stand here, you don't know what the numbers may or may not be post-2008? No, Judge Jordan. Okay. Fair enough. Okay. I don't want to monopolize the conversation, but I'll keep going with that, but then tell me how you think EDPA helps you with regards to that issue. Well, exactly the same way this court enunciated in Hill versus Humphrey. There is no clearly established federal precedent that states that Georgia's burden of proof for intellectual disability claims is unconstitutional. And as this court enunciated so well, again, it laid out exactly what it means to be clearly established. It must be in the holdings. It can't be in the dicta. And there is no case in the U.S. Supreme Court directly on point on this issue. The closest would be Cooper, but again, Cooper deals with a fundamental right that has been around for a long time and it is- Different. It's different, right? Yes. What do you do about cases like Panetti, which did not have a prior decision as they say on all fours, but nevertheless reverses and grants at least partial habeas relief through the enunciation of something that might be regarded as somewhat new or newer? Well, I did not see Panetti as that way. I saw Panetti as they looked specifically to Ford versus Wainwright. And there's a lot of language in Panetti. I understand we're talking a lot of dicta, but at the end of the day, what they said in Panetti was that in Ford, we did say you had a specific right to a hearing. And that's why we're finding that you have violated the Supreme Court law. But it wasn't just a hearing, there was a little bit more about what that hearing has to involve. Well, true. I think that, but at the end, it was about the fact that Ford had given them a right to a hearing. And that's, I mean, I think that distinguishes it on its face. Okay. One last question then. If no capital defendant has ever been able to establish mental disability beyond a reasonable doubt before a jury or before a state habeas court, would that change your argument in any way, either on a de novo level or under AEDPA deference? No, I don't think that would change our argument either way. Would it matter then how long the period of time was to calculate the statistics? In other words, and I'm going to give you a set of numbers that don't apply here. I don't have to do major calculations here. No, no, no. I wasn't good at math either. So if you had a period of 50 years in which no one was able to satisfy a certain burden of proof, would that be a relevant consideration for a court trying to figure out whether that burden of proof was constitutional or not? Under Cooper, I think that that would be a consideration. It may not be dispositive, but it would certainly be a consideration. Yes. Okay. Okay. Thank you. Okay. Unless the court has any other questions regarding our burden of proof, I will go to the ineffective assistance of counsel claim. Judge Hull, you asked regarding the investigation done by trial counsel. I think our brief sets it out. Trial counsel did hire, well, when I say they hired five experts, I do agree with my opposing counsel that Ms. Sumner was part of Dr. Savino's team. But in that, they did a thorough investigation of his life. They knew the sum of his life. I have not seen in petitioner's brief any significant information that trial counsel was unaware of regarding petitioner's . . . He says the record doesn't tell us whether or not the lawyer even reviewed what Ms. Sumner came up with or Dr. Savino's report. So what do you say about that? Well, first of all, I don't think he could benefit from a silent record. Those records were found in trial counsel's files. So it must be assumed that they did look at it. And Mr. Hatfield, who testified during the state habeas hearing, said he knew all of this information, almost all of the information. There were some things in the affidavits he said that he wasn't aware of, but he didn't specify what they were. But there's no information in here showing that Mr. Wilson did not review the information that was in his own files. So you're saying that Sumner and report and Dr. Savino's report were in trial counsel's files? I do believe so, Judge Hull. I reviewed that record this past week, and I do believe I saw that in their files. So they had all of the information from their own experts. They spoke with Petitioner's mother and father. They spoke with his two uncles. And I do believe they spoke with his sister. Obviously the affidavits say that, you know, they didn't speak with, you know, no one spoke with us. They didn't talk to us about this. That's not uncommon in these cases, obviously. I would say that this case is very much like Bobby versus Van Hook, where in very similar, they had mental health experts. They spoke to the closest family members. And then in State Habeas, trial counsel, State Habeas counsel came along, and they had many affidavits from extended family and friends saying, oh, we could have told you so much more. But in this particular case, they had all of the relevant information they needed. And then they made strategic decisions. I mean, Mr. Hatfield was very clear about that. They made strategic decisions not to present the family members during the sentencing phase and not to pursue mental health any further. They felt that they were aggravating information in both of those, from his family and in the mental health. And if you look at the central state file, there is aggravating information in there. He was diagnosed as antisocial by two of the, I think it was Dr. Tirith Gall and Dr. Anita Ray-Smith. So there was aggravating information, and they made a strategic decision. As Mr. Hatfield said, you know, another person could have decided to present this differently, but we specifically chose not to present this information in the sentencing phase of trial. They felt like they had gotten it out with Dr. Grant, and they even, and Mr. Wilson even referenced it in his closing argument in sentencing. To say that they didn't consider this information, they didn't consider doing a mitigation investigation, and to say that Dr. Grant was solely focused on mental retardation, sorry, intellectual disability, then that would be, I think, an inaccurate reading of his very own report, which has him diagnosed with antisocial personality features. It has him diagnosed with polysubstance abuse. If he was just looking at that, then that seems very unusual. Some of the reasons that counsel gave, not all, but some of the reasons that counsel gave at the post-conviction hearing for not putting on certain family-based mitigation testimony was a fear that some other bad or negative evidence would come out. But some of it was brought out by the state in trying to establish other aggravating circumstances, right? So some of that was already there. There was no way of avoiding it. I agree, Judge Jordan, and Mr. Hatfield, you know, he said absolutely some of that information came out, but they did not want more information. They did not want his mother on the stand saying that he'd started beating her since the age of 15. This was when his brother testified during the sentencing phase. That was an isolated incident where he allegedly pushed his mother down and he punched his sister and they got into a fight. If trial counsel had put up his closest family members, they would have seen that this had been a pattern and a practice for years that petitioner had been involved in. They had been beating his mother, his father, his sister, and he'd also been beating up his brother as well. So there's one thing to say that, yes, they had some information before him that he got into a fight with his family, but I think the way that Mr. Hatfield described it, it's another thing for them to get up and give much more testimony regarding that information. Does that answer? Yes, thank you. So looking at this record as a whole, and again, looking at it through 2254, I don't think you can say that there's no reasonable basis for the state habeas court or the Georgia Supreme Court in denying the CPC in this particular case. It's not an extraordinary case. This is, to me, a typical case where trial counsel, they have done a thorough mitigation, a thorough investigation, whether they thought of it in their head as a mitigation, whatever, they did a background investigation of Petitioner, and they made strategic choices. They knew that there was aggravating information in there, and they were afraid that would come out. And that is entirely reasonable. There's one thing for them to present, I mean, Petitioner- What was aggravating besides the diagnosis? Of the antisocial personality disorder? Yes. In several of the, Dr. Savino's report is rather cursory, but Mr. Hatful stated that they talked with him and that he had aggravating information, and they felt if they put him on the stand, that other aggravating information would come out. And I think some of that had to do with him being his family, but also, I do believe Dr. Savino's report talks about, and I could be mixing it up with Dr. Savino, it talks about the fact that he was obsessed with his ex-wife, and he was very angry with her. And really, that's who he wanted to take out all his frustration on, that he wanted to beat her, he wanted to get her. And here, you know, I mean, they felt that that could be aggravating. I think that would be reasonable to say. I thought I remembered something that he had beat his mother at some point. Was that in there, or that's not true? No, that's true. She did report that he had been beating her since age 15. I believe she reported that to Ms. Sumner in the social history report. She did. So, trial counsel should have been aware of that. That was in their files. So, as I stated, you know, trial counsel did a thorough investigation. There was aggravating information in there. Maybe someone else would have tried the case a different way, but Petitioner was 24 years old when he committed this crime. He was not, I mean, according to the record here, he had been abusing every member of his family since he was 15 years old. For them to put up them and say, oh, well, you know, yes, he was abused when he was a kid, and now he has been abusing us, I think a reasonable person, a reasonable trial attorney could have decided that was a bad, bad strategy to go with. And that's what we're looking at, reasonableness. Because you do work in the Attorney General's office and handle these cases, I'm curious how many times, and it's not that we, it's not presidential value, but I'm just curious why the Supreme Court doesn't take from, because I've seen at least twice they've denied cert on direct appeal on the burden of proof issue, where it would clearly be de novo. Has it been more than twice that they, I know in the Hill case they had tried to go up, straight up, or maybe another case, I don't know. It was at least twice. I thought it was more than that. I thought it was four. Yeah, me too. But do you know how many, you don't know how many times? I thought it was at least four cases, but again, I don't. Right. That they've had this burden of proof issue where they were not successful at trial. And then on direct appeal, the Georgia Supreme Court follows its precedent. And then they try, before the collateral review, they try to go get a cert granted on that issue. I'm just trying to make sure I remembered this correctly. Yes, I do think there was one on direct review from direct appeal, and then there were others from collateral. State collateral. Another from collateral. That's a deeper, so that doesn't, they still have all that. That doesn't do anything. No. On state collateral, you still get de novo reviews. You still get de novo. Yes. Okay. I see. I see. Okay. So, all right. So, I'm just curious. All right. So, from, yeah, right, because it wouldn't be federal. Okay. So, they've done it from state collateral and from state direct appeal. Okay. I just don't, if it's so clear, I don't understand why they don't answer the issue. And in Head v. Hill, when the Georgia Supreme Court decided this issue, they specifically told the U.S. Supreme Court in that opinion, if we've got it wrong, then it's for you to tell us. And they denied cert at that particular time. Right. Unless the Court has any more questions, I would just ask that you affirm the decision of the District Court. Thank you very much. Thank you. Your Honor, even if you view this not as an investigation case, but as a presentation case, I submit this case is extreme. Not a single witness was presented. And the only thing the state says is this is a reasonable strategic call, because if witnesses have been called at sentencing, when not a single witness was presented, not one, that harmful information would have come out. This was a case in which all of that harmful information was already out. There was already evidence in the record that Petitioner had assaulted his mother, his brother. That's all the more reason why there needed to be evidence in litigation. Was that in the guilt phase? Did they have that in the guilt phase? No. The state put that on in aggravation. I see. In the sentencing phase. Absolutely. And there was no cross-examination of that evidence. That's all the more reason why you need a mitigation case to call the family members, the neighbors, to explain, to put in context, to show that these events were not just events of some creature who started out mean and only got meaner. This is why the evidence of abuse when he is four years old is so critical. This is not some one-way street of some antisocial, vile individual who simply assaults everyone in his path. This is someone who started out at age four years old getting beaten brutally by his father, beaten by his mother. This is the environment in which he was raised. None of that was presented. Nothing. All you have is the state pouring on, pouring on, aggravation evidence, and counsel doing nothing. That is not effective assistance of counsel. The second thing is turn to the mental illness. This is a case that cried out that there was something seriously wrong with the defendant. There was a conviction for necrophilia, which the defendant had admitted to the police. He had given other information about the bizarre aspects of this case. Counsel hired Dr. Savino, and Dr. Savino, in his report, which, yes, is in counsel's concluded, and this is in the supplemental appendix, and I quote, Mr. Rolison's sense of detachment and disturbed sense of what is normal in human relations leaves a feeling of talking to someone who is here but who is not here. It is my psychiatric opinion that Mr. Rolison is both mentally ill and mentally retarded per Georgia Code 17731. This is Savino. This is before trial. Counsel has evidence this man is mentally ill. He obviously is mentally ill. None of that is presented at trial, at guilt innocence, at sentencing. So you have the state saying this is a creature, someone who started out mean and only got meaner. This is a man who's mentally ill, but there's none of that presented in this case. So of course the jury had only one picture. What did Dr. Grant say? Dr. Grant did not testify one bit about mental illness. Only mental retardation. Only mental retardation. It was in his report, and his report did not go to the jury, and we provided the sites for that in our brief. The report itself was not sent to the jury. So there was nothing in this case about mental illness. But his mental illness would have included being antisocial? It may have, Your Honor, but my goodness, can you look at this record and not say that there's evidence that this person has an antisocial behavior? All the evidence that Grant put in, he was assaulted. He got a lot of precedence about that, though. You don't have a case like this one. We have a lot of precedence, though, about the significance of an antisocial personality disorder. Sure. Of course. Right. Of course. And its aggravating effect. Of course. But again, in this case, you've got three murders. You've got a record where the defense's own one witness, Dr. Grant, testified, here's a person who was assaulted, he didn't fit in his family, he got fights with his father. He was assaulted at school. All of that was there. The problems of Billy Rawlinson, including his assaultive behavior, was there. What this case cried out for is, why? Why is this man so assaultive? Why is he so antisocial? And it's because he was beaten as a child, he was mentally ill. There was an explanation, at least a case to be made, and counsel said nothing. When the time came at sentencing to hear if there was any reason why this man should live, counsel rested, presented nothing, then in closing argument disavowed the only defense he had. He said, you found he's not mentally retarded, so we can take that off the table. If this is effective assistance of counsel in a capital case, sure, you've got bad facts, I don't deny that. But there's a case to be made, and that's what we presented in State Habeas. You can't look at those affidavits, 33 of them, and this is a small town. These were not people who were across the country. They were across the street, they were down the road. These were neighbors, these were family members. You can't look at those 33 affidavits and say there wasn't a mitigation case to present it here. There was such a case. Counsel didn't know it. He didn't talk to these people. He never talked to the sister. There's nothing in the record that he talked to the sister. He didn't know that mitigation case was there. He couldn't make a strategic decision not to present it, and he presented nothing. And under the clear precedents of the United States Supreme Court, that is ineffective assistance of counsel. Thank you for hearing me. I apologize for pressing the point. We want to thank you. You're pro bono, and you've accepted the appointment and done excellent briefs, and in your representation, they really are excellent briefs, and they reflect a tremendous amount of time, and of course, we thank the State for its work, too, but particularly, we know how much time and effort and expense to serve in this case, and we cannot do our jobs without the help of the Bar, as you're aware. It's a privilege to be here. Thank you, Your Honor. Thank you. The court will be in recess.